THE MANHATTAN RAILWAY COMPANY, Plaintiff, v. THE MAYOR, ALDERMEN AND COMMONALTY OF THE CITY OF NEW YORK, Defendant.

*Elevated railway in a city street — expense involved in making alterations in its structure. by the building of an intersecting viaduct by a city, is a charge against the city.*

The city of New York, being the owner of the bed of Eighth avenue in said city, consented, in September, 1875, to the erection of the elevated railway and appurtenances and stations in such avenue, of which the Manhattan Railroad Company is now the owner.

After many millions of dollars had been expended in the construction and in the payment of damages to abutting owners for injuries occasioned to their easements by the elevated railway, the Legislature authorized the city of New York to erect and construct over and along One Hundred and Fifty-fifth street, from the easterly line of St. Nicholas place to MacComb's Dam bridge, an elevated iron roadway, viaduct or bridge. The grade of the viaduct, as established by the plans approved by the commissioner of public works of said city, crossed Eighth avenue at such a height as to intersect the upper portion of the elevated railway's iron stations at that point. In order to permit the viaduct to pass over the stations so as not to seriously impair their usefulness or weaken the structure to the point of danger to the traveling public, extensive alterations became necessary on the part of the elevated railway involving a large expenditure. The elevated railway had the right to erect and maintain its stations where it did, and the viaduct was lawfully built where it was erected by the city under the authority of the Legislature.

In an action brought by the elevated railway company against the city of New York to recover the expense necessarily involved in making the alterations necessitated by the building of the viaduct,

*Held,* that the steps taken by the plaintiff and defendant, pursuant to legislative authority, leading up to the construction of the railway and its appurtenances, did not indicate that it was the intention of the parties that the elevated railway's right to maintain the structure should be of such a conditional character that the Legislature might, by subsequent enactment, authorize the destruction of the whole or any part of it without just compensation;

That the rights so acquired and the property thus created could not be defeated and destroyed for the benefit of the city of New York without compensation;

That in accepting the franchise the elevated railway did not impliedly agree to alter these structures from time to time for the purpose of providing highways for the public at or near the same grade;

That the rule that an abutting owner cannot recover damages because of the change of grade in a street, unless some of his rights in the nature of easements are interfered with, did not apply to the case at bar, and that the elevated railway was entitled to recover from the city the cost of making the changes in question.

SUBMISSION of a controversy upon an agreed statement of facts pursuant to section 1279 of the Code of Civil Procedure.

*Julien T. Davies* and *Alexander S. Lyman,* for the plaintiff.

*Francis M. Scott, Theodore Connolly* and *Terence Farley,* for the defendant.

PARKER, J. :

The defendant, being the owner of the bed of Eighth avenue, consented, in September, 1875, to the erection of the elevated railway, appurtenances and stations in that avenue, of which the plaintiff is the owner.

After many millions of dollars had been expended in its construction, and in the payment of damages to abutting owners for injuries occasioned to their easements of light, air and access, the Legislature, by chapter 576 of the Laws of 1887, authorized the defendant to erect and construct over and along One Hundred and Fifty-fifth street, " from the easterly line of St. Nicholas place to MacComb's Dam bridge, an elevated iron roadway, viaduct or bridge."

· The gradient of the viaduct, as established by the plans approved by the commissioner of public works, crossed Eighth avenue at such a height as to intersect the upper portion of the plaintiff's iron stations at that point.

In order to permit the viaduct to pass over the stations so as not to seriously impair their usefulness, or weaken the structure to the

point of danger to the traveling public, extensive alterations became necessary, involving an expenditure of $9,960.

Between the defendant and the plaintiff there was a dispute as to which party should bear the expense. To avoid the delay in the construction of the viaduct, which a suit to determine that question would occasion, an agreement was made which permitted the work to be done at once, leaving the question of liability for the determination of the court.

In this submission of the controversy it is agreed on the one hand that the plaintiff had the right to erect and maintain its stations where it did, and on the other hand that the viaduct was lawfully built where it was erected, under the authority of the statute already referred to.

The mere statement of the fact that structures, such as the plaintiff's stations, lawfully erected, and with the full consent of the defendant, were by its act damaged, would seem to establish the right of the owner to compensation.

If the stations had been erected on plaintiff's land instead of in a public street, and the defendant had truncated them with a viaduct, there would be no question of its right to compensation for the damage done.

The fact that its erection is upon and over a street of the defendant, in view of the defendant's consent given pursuant to legislative authority, and for the purpose of inducing the plaintiff to construct and operate an elevated railway for the convenience of the public, does not seem to present a situation different from what it would be if the stations were upon lands belonging to the plaintiff.

The steps taken by the plaintiff and the defendant, pursuant to legislative authority, leading up to the construction of the railway and its appurtenances, do not indicate that it was the intention of any of the parties that the plaintiff's right to maintain the structure should be of such a conditional character that the legislature might, by subsequent enactment, authorize the destruction of the whole or any part of it without just compensation.

It was not laid out and constructed, like the ordinary railroad, by a corporation created under the General Railroad Act (Chap. 140 of the Laws of 1850), with little if any of its line definitely located, but with the machinery provided whereby it might acquire private

property, and the right to cross public streets and the tracks of other railroads. Instead, its promoters presented a plan which was intended to prevent interference to any great extent with the public use of the streets, by constructing the railroad bed so far above the streets as to make it impossible for the structure to interfere with traffic on the avenue.

The general scheme proved acceptable to the defendant and the Legislature, the latter body providing the necessary safeguards for the construction of elevated railways, of which the plaintiff's is one. Under what is known as the Rapid Transit Act (Chap. 606, Laws of 1875) commissioners were appointed who subsequently organized the plaintiff, according to the terms of the statute authorizing their appointment. They prepared the articles of association and specified the routes and framed a general specification relating to the construction of supports, turnouts, stations, platforms, etc., under which all of the stations of the plaintiff, including the one in question, were located and constructed.

With reference to that plan of construction and under the guidance and direction of the commissioners, the plaintiff proceeded to and did expend large sums of money, resulting in the completion of the property in accord with the methods prescribed by legislative enactment, and under the direction of officials representing the defendant.

Certainly, the rights so acquired and the property thus created cannot be defeated and destroyed for the benefit of the defendant without compensation. (*People* v. *O'Brien,* 111 N. Y. 1.) And it would seem to be equally true of a part as of the whole.

The character of plaintiff's rights in the street, whereby it lawfully maintained all its structures on Eighth avenue, including the stations at One Hundred and Fifty-fifth street, has been repeatedly, in one form and another, the subject of judicial consideration.

In *People ex rel. N. Y. El. R. R. Co.* v. *Commissioners* (82 N. Y. 462) the question was whether the relator's elevated railroad structure, being located on the land of the city, was taxable as real estate. The court held that it was.

In *White* v. *Manhattan El. Ry. Co.* (139 N. Y. 19) the court had under consideration the legal effect of a consent (not under seal) by an abutting owner, the fee being in the municipality, to the

erection of an elevated railroad in front of his property. It was held to operate as an abandonment of the easement to the railroad, and in the course of the opinion the court said : " The railroad company having procured the consent of the authorities of the city to the construction of the railroad in the street or square in question, upon the terms agreed upon, such company obtained an interest in and, to a certain extent, a title to the street for the purpose of the construction and operation of its railroad, which was in the nature of property, and which was sufficient to enable it to treat with abutting property owners in the character of one who had an interest in the servient estate."

The legal effect of the consent by the defendant to the erection of plaintiff's railroad was presented by a still different situation in *Herzog* v. *N. Y. El. R. R. Co.* (14 N. Y. Supp. 296 ; affd., 76 Hun, 486).

The suit was brought by Herzog, an abutting owner, for an injunction and damages, but it being made to appear that Herzog's grantor, the city of New York, was the owner of the premises at the time its consent was given to the construction of the elevated railroad, the complaint was dismissed, the court holding that the corporation having acted upon the consent of the city and built its road, " the right to use such property so devoted for the railroad vested absolutely and irrevocably in the railroad corporation."

The argument of the court fully sustains the proposition we have asserted in this case, to wit, that the plaintiff has such a property right in the elevated railroad and structure that the city cannot physically interfere with it, even under the sanction of legislative authority, without responding for the direct damage which such interference occasions to the plaintiff.

The Legislature has the power, from time to time, to authorize the construction of viaducts, bridges and other structures for the public use, which shall cross the plaintiff's roadbed and appurtenances, but if such crossing shall necessarily put the plaintiff to expense in the rebuilding, repairing or strengthening of its structure it may have compensation therefor.

With the first part of the last proposition the learned corporation counsel agrees, but the last he insists is in conflict with certain authorities holding :

1. That a railroad must maintain its crossings so as to meet and provide for the necessities of an increased population or traffic; and,

2. That there is no liability on the part of a city arising from a change of grade.

The authorities in this State bearing upon his first position have their foundation in chapter 62 of the Laws of 1853, which authorizes the laying out of highways across the track of any railroad now laid, or which may hereafter be laid, without compensation to the corporation owning such railroad.

In *Albany Northern R. R. Co.* v. *Brownell* (24 N. Y. 345) this statute was before the court, and the objection that it was unconstitutional was considered and overruled, the position taken being that a railroad corporation acquires its right to construct its road upon or near the natural surface of the earth, subject to the dominant right of the State to cross its roadbed whenever the public necessity demands that new streets shall be opened.

And the requirement that the railroad corporation shall make the necessary excavations and embankments for taking the highway across the railroad is neither unlawful nor unreasonable, for the disturbance of the natural surface of the ground, making such work necessary, is the work of the railroad corporation itself.

The court, however, manifested a disposition not to extend the statute, but to construe it strictly. The contemplated highway which the suit was brought to enjoin was laid out across the tracks of the railroad and also across grounds acquired as sites for a station house, engine house, etc. As to the first, the court held that the action of the highway authorities was lawful, but as to the second unlawful.

In the course of the argument the court said that land purchased for stations " does not fall within the policy which contemplated that the track of the railroad might be so used. The use of the land acquired by the railroad company for its track was such as admitted of a concurrent use for the purposes of a highway, but it was quite otherwise with that which was obtained for the engine house and other structures."

It may be assumed that the Legislature of 1853, in enacting the statute to which we have referred, did not contemplate the passage of a viaduct over an elevated railroad, which was a form of rail-

way construction at that time unknown, and hence the statute should not be regarded as applicable.

A still further reason for holding that it is not applicable may be found in the fact that the novelty of the elevated system led to legislation especially adapted to it, having for its purpose not only the protection of the capital invested, but the safe guarding of the public interests as well. And it is proper to assume, in the light of that legislation, that whatever burdens the State intended that the plaintiff should bear with the grant given to and accepted by it were enumerated.

Clearly it should not be held that in accepting the franchise the plaintiff impliedly agreed to alter its structures from time to time for the purpose of providing highways for the public, at or near the same grade, for an important part of the plan was to place all of the plaintiff's structures so far above the street as to render it impossible that the public streets or those using them should come in contact with the elevated railroad.

But if this position were not well taken, and it could be held that the statute of 1853 is applicable to an elevated railroad, still, under the construction of the statute given in the *Albany Northern Railroad Company's Case* (*supra*) it would not be the duty of the plaintiff to bear the expense incurred in this case. The viaduct crossed plaintiff's road at a point where it had lawfully constructed railroad stations, and the property interfered with, and which had to be altered and strengthened, were the railroad stations, and it was distinctly held in that case that the statute does not refer to property acquired by a railroad for station purposes.

The contention of the defendant, that it is not liable for the damages resulting to the plaintiff, because that which it did was merely to change the grade of One Hundred and Fifty-fifth street, seems to us unsupported by the facts.

It is undoubtedly the general rule that an abutting owner cannot recover damages because of a change of grade of a street unless some of his rights in the nature of easements, which constitute property, are interfered with, such as the right of ingress and egress. (*Reining* v. *N. Y., L. & W. Ry. Co.,* 128 N. Y. 157.)

It would seem that that rule would not be applicable to this situation, even if it were the fact that the erection of the viaduct con-

stituted a mere change of grade, for this is not a case of indirect damage occasioned by the raising of the grade of the street. Plaintiff's property was actually taken. It stood in the way of the viaduct, the completion of which required the taking of some portion of it, and so it was taken. As it was a lawful structure the owner of it was entitled to compensation for the taking.

But we find nothing in this record which supports the defendant's assertion that this was a mere change of grade.

The statute did not authorize the commissioner of public works to change the grade, but to improve and regulate the use of One Hundred and Fifty-fifth street, "and for that purpose to erect and construct *over* and *along* said street from the easterly line of St. Nicholas place to MacComb's Dam bridge, an elevated iron roadway, viaduct or bridge, with the necessary abutments, arches, over intersecting avenues and approaches thereto," etc.

And the fact is that the grade of the street was not changed by the building of the viaduct or when it was built. The street remains, as before, open to the public, with its surface wholly unchanged. The viaduct constitutes an additional thoroughfare, built over and along One Hundred and Fifty-fifth street, supported by columns resting in the bed of the street. It sustains substantially the same relation to the street that the plaintiff's railroad structure does to Eighth avenue.

The facts, therefore, *do not support the defendant's contention*, were it otherwise well grounded.

Judgment ordered for the plaintiff, as demanded in the submitted controversy, with costs.

Follett, J., concurred; Van Brunt, P. J., concurred in result.

Judgment ordered for plaintiff, with costs.