INGRAHAM, P. J. (concurring).   I concur in the reversal of this judgment upon the ground that the evidence did not establish that the defendant was guilty of negligence.   There was no satisfactory evidence that the gate refused to work because of any defect in the gate itself, or that this loose spring could have held the gate in position after the elevator had been moved.   The evidence shows that the gate worked properly immediately before and after the accident.   Upon the whole evidence, I think it conclusively appeared that the defendant exercised all the care possible to keep this machinery in good order.

---

### NEW YORK CENT. & H. R. R. CO. v. CITY OF NEW YORK et al.

(Supreme Court, Appellate Division, First Department.   February 3, 1911.)

1. MUNICIPAL CORPORATIONS (§§ 680, 681*)—STREETS—OCCUPATION BY RAILROAD COMPANY—POWER TO GRANT.

At the time of the incorporation of the Hudson River Railroad Company by Laws 1846, c. 216, and the New York Central & Hudson River Railroad Company by Laws 1869, c. 917, the state alone could grant a franchise to operate a surface railroad on the streets of New York City, and, this power being uncontrolled by any constitutional provision, the city government of New York had no power to permit the use of the streets for such a purpose.

[Ed. Note.—For other cases, see Municipal Corporations, Cent. Dig. §§ 1459–1466; Dec. Dig. §§ 680, 681.*]

2. RAILROADS (§ 78*)—FRANCHISES—USE OF STREETS—CONTINUATION.

Laws 1846, c. 216, created the Hudson River Railroad Company with power to construct a railroad commencing in the city of New York and extending to some point on the Hudson River opposite the city of Albany, authorizing the directors to locate their road on any of the streets or avenues of the city of New York, within specified limits, provided the consent of the corporation was first obtained.   The act provided that the corporation should continue for 50 years, and by ordinance of the New York City council passed May 6, 1847, the railroad's route along the streets of the city was specified and confirmed.   Under authority of Laws 1869, c. 917, a consolidation of the Hudson River Railroad Company with certain other corporations that had been formed to operate a continuous line from Albany to Buffalo was made, by which the consolidated company when formed was to continue for 500 years, and succeed to all the rights, privileges and franchises of each of the corporations included therein.   Held, that the franchises thus transferred were not limited by the period of the original grants to the consolidated corporations, but that the consolidation operated as a new grant to the new corporation during the period of its corporate existence, thus vesting in the consolidated corporations a right to operate trains over the tracks laid in the streets of the city of New York for the term of 500 years.

[Ed. Note.—For other cases, see Railroads, Cent. Dig. § 194; Dec. Dig. § 78.*]

3. EMINENT DOMAIN (§ 322*)—STREETS—OWNERSHIP OF FEE—EASEMENT.

Where a railroad corporation was authorized to operate its road over certain unopened streets in the city of New York, and, in order to render such franchise available, acquired title to the land within the bounds of the streets necessary for the construction of its road along the route designated by condemnation, and thereafter the city acquired the fee of the land in the streets, paying the railroad company a nominal sum for the

---

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

title, the fee so acquired was subject to the railroad company's franchise to occupy the street for railroad purposes.

[Ed. Note.—For other cases, see Eminent Domain, Dec. Dig. § 322.*]

4. RAILROADS (§ 18*)—CORPORATIONS—FRANCHISE.

A statute creating a railroad corporation grants it a franchise. not only to exist as a corporation, but to construct, maintain, and operate a railroad in order to carry out the objects of its existence.

[Ed. Note.—For other cases, see Railroads, Dec. Dig. § 18.*]

5. RAILROADS (§ 79*)—USE OF STREETS—INJUNCTION—RIGHT TO SUE.

Where the state Legislature, pursuant to an exclusive right, granted a franchise to a railroad company to occupy certain streets in a city for railroad purposes, and the railroad company, in the exercise of such franchise, maintained tracks in the streets for many years, the right to enforce a removal of the tracks, if any, either as a nuisance or because the franchise had expired by limitations, vested in the state, and not in the municipality.

[Ed. Note.—For other cases, see Railroads, Dec. Dig. § 79.*]

Appeal from Judgment on Report of Referee.

Suit by the New York Central & Hudson River Railroad Company against the City of New York and others. From a judgment in favor of complainant, defendants appeal. Affirmed.

See, also, 135 App. Div. 331, 119 N. Y. Supp. 999.

Argued before INGRAHAM, P. J., and LAUGHLIN, CLARKE, SCOTT, and MILLER, JJ.

William P. Burr, for appellants.

Charles F. Brown, for respondent.

INGRAHAM, P. J. The plaintiff in this action has been, awarded an injunction restraining defendants from removing its tracks upon certain streets in the city of New York, and the determination of this appeal depends upon the duration of the franchise granted to the Hudson River Railroad Company by chapter 216, Laws 1846, and the effect of chapter 917, Laws 1869, under which the plaintiff was incorporated. The referee in a careful opinion has stated the facts in relation to the incorporation of the several railroad companies which under the act of 1869 were consolidated into the corporation then organized, and which is the present plaintiff. The real question presented on this appeal is whether the city of New York can remove the tracks of the plaintiff located in certain public streets and avenues which was expressly authorized by the act of 1846 under which the Hudson River Railroad Company was incorporated, and in which streets and avenues the plaintiff has maintained these tracks and operated its railroad under the franchise then granted.

In considering this question, we must bear in mind that at the time these several acts were passed the state only could grant a franchise to operate a surface railroad in the streets of the city of New York, that its power to grant such a franchise and authorize such a use of the surface of the streets was uncontrolled by any constitutional

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

provision, and that the municipal government of the city of New York had no power to grant such a franchise or permit the use of the streets of the city for such a purpose.   People v. Kerr, 27 N. Y. 188; Potter v. Collis, 156 N. Y. 16, 50 N. E. 413; City of N. Y. v. Bryan, 196 N. Y. 158, 89 N. E. 467.   The Legislature thus possessing the absolute power to grant a franchise by section 1, c. 216, Laws 1846, created a body corporate by the name of the Hudson River Railroad Company with power to construct a single, double, or triple railroad or way between the cities of New York and Albany, "commencing in the city of New York, with the consent of the corporation of the city of New York, and passing through the counties of Westchester, Putnam, Dutchess, Columbus, and ending at some point on the Hudson River, in the county of Rensselaer, opposite the city of Albany, * * * with power to construct such branch or branches, for depot and station accommodations, as may be required for the business of such railroad; and to transport, take or carry any property and persons upon the same, by the power and force of steam, of animals, or of any mechanical or other power, or of any combination of them, for the term of fifty years from the passage of this act." Section 4 of the act provided that the directors named in the section should open books to receive subscriptions to the capital stock of the corporation, and the stockholders should have power when one-half of the capital stock to the amount of $3,000,000 should have been subscribed and 5 per cent. thereof paid in to exercise the powers and privileges conferred by the act; that thereupon the directors should cause to be made examinations and maps for the said railroad as might be necessary to the selection by them of the most advantageous line or lines for the location of the road; that the directors should, after such examinations and surveys have been made, select, and by certificates drawn or suitable maps under their hands and seals, designate the line, course, or way which they might deem most advantageous for the said railroad, which certificates for lands lying in the county of New York should be filed in the office of the register of the city of New York, which line, course, or way so selected and certified shall be the line, course, or way on which the said corporation shall construct, erect, build, or make their railroad, with a single, double, or triple track as therein mentioned; that:

"The said directors may locate their railroad on any of the streets or avenues of the city of New York, westerly of and including the Eighth avenue and on or westerly of Hudson street, provided the assent of the corporation of said city be first obtained for such location."

By subsequent sections of the act the corporation was authorized to purchase, receive, and hold in fee simple such real estate and other property as might be necessary to accomplish the purpose for which the franchise was granted.   It was authorized to purchase the real estate entered upon by private sale, and, in case an agreement could not be made between the said corporation and the owners of any property which might be required for the purposes mentioned, or which might be affected by any operation connected therewith, to acquire the land by the right of eminent domain.   "And the said corporation shall

thereupon become seised in fee of such land, during the continuance of the corporation, by this or any subsequent act, and may take, hold and use the same for the purposes of said road." Section 13 of the act provides:

"The said corporation is hereby authorized to construct, erect, build and make and use, a single, double or treble railroad or ways, of suitable width and dimensions, to be determined by the said corporation, on the line, course or way whereon to construct, build or make the same; and shall have power to regulate the time and manner in which goods and passengers shall be transported, taken and carried on the same, subject nevertheless to the control and direction of the Legislature, or of any officer appointed by it for that purpose; and shall have power to erect and maintain toll houses and other buildings, for the accommodation of their concerns, as they may deem suitable to their interests "

Section 22 of the act provided that the said corporation shall possess the general powers and be subject to the general restrictions and liabilities prescribed by such parts of the third title of the eighteenth chapter of the first part of the Revised Statutes as are not repealed.

This act took effect on May 12, 1846, and on May 6, 1847, the mayor, aldermen, and commonalty of the city of New York passed an ordinance whereby permission was granted to the Hudson River Company to construct a double line of tracks with suitable turn-outs along the line of the Hudson River from Spuyten Duyvil creek to near Sixty-Eighth street, occupying so much of the Twelfth avenue as lies along the shore, thence winding from the shore so as to intersect the Eleventh avenue at or near Sixtieth street; thence through the middle of Eleventh avenue to about Thirty-Second street; thence on a curve across to the Tenth avenue, intersecting the Tenth avenue at or near Thirtieth street; thence through the middle of the Tenth avenue to West street, and thence through the middle of West street to Canal street, the railroad company to grade, regulate, pave, and keep in repair a space 25 feet in width in and about the tracks in all the avenues and streets through which the said track or tracks shall be laid, whenever the common council shall deem the interest of the public to require such pavement to be done. The railroad company was also required to lay such rails or tracks through the avenues and streets in conformity to such directions as to line and grade as should be given by the street commissioner, and should conform their said railroad to the grades of the avenues and streets through which it extended or crossed as should be from time to time established by the common council if the latter so required, and should lay their rails or tracks in the streets and avenues in such manner as to cause no unnecessary impediment to the common and ordinary use of the streets for all other purposes. The said company was also required within one year from the passage of the ordinance, and before entering upon any contracts for grading, to file in the office of the street commissioner a map showing the location and intended grade of said railroad, and permission was granted to the railroad company to run their locomotives as far south as Thirtieth street and no further, and the railroad company was required to execute an instrument in writing agreeing to stand to, abide by, and perform all such conditions and requirements as were

contained in the second and third sections of the ordinance. On or about August 12, 1847, the said corporation executed under its corporate seal an instrument in writing as provided for in the ordinance. On September 2, 1847, the railroad company filed in the office of the register of the city and county of New York its map exhibiting the routes of the railroad as located from Canal street to the northerly side of Spuyten Duyvil creek in the city and county of New York, and thereafter the common council passed a resolution authorizing the railroad company to lay down a double line of tracks with suitable curves from the northerly line of Canal street to West street through Canal and Hudson streets to Chambers street.

In pursuance of the authority thus granted and the consent of the corporation of the city of New York, the railroad company completed its line of railroad from New York City to a point on the Hudson river opposite the city of Albany, whereupon the common council of the city of New York on October 24, 1851, passed a resolution that the citizens of New York had great cause for congratulation for the construction of this railroad and the thanks of the municipal authorities of the city of New York were eminently due, and the same were tendered to the officers of the company. At the time of the construction of the railroad Twelfth avenue had not been opened north of Sixty-First street, Eleventh avenue had not been opened north of Forty-Eighth street, and the railroad company acquired title to the lands within the bounds of those avenues necessary for the construction of its road along the route designated. Subsequently the corporation of the city of New York acquired the fee of the land in these avenues paying to the railroad company a nominal sum for acquiring title to the land which had been acquired by the railroad company. The fee thus acquired was, of course, subject to the franchise granted by the state to the railroad company to occupy the streets for railroad purposes. The conditions imposed by the act of 1846 were complied with. The municipal corporation of the city of New York had consented to the construction of the road within the city of New York and had assented to the location of the railroad on certain of the streets and avenues of the city of New York and the railroad company had constructed its road and proceeded to maintain and operate it as provided for by the grant of the franchise. It must be conceded, I think, that the Hudson River Railroad Company thereby acquired a franchise to construct, maintain, and operate a railroad upon the course adopted by it within the city of New York which neither the corporation of the city of New York nor any power except the state of New York could interrupt or interfere with. The use of the franchise was not thereafter in any respect subject to the control of the city of New York, and the railroad company continued in the enjoyment of the franchise down to the year 1869. It may be conceded that the grant of this franchise was limited to 50 years from the passage of the act. The grant was expressly so limited and the duration of the fee of the land held by the railroad company was limited to the continuance of the corporation by that or any subsequent act.

Prior to the year 1869, there existed a railroad extending from the city of Albany to the city of Buffalo which had been operated by a

corporation known as the New York Central Railroad Company. This corporation had been organized by the consolidation of several railroads separately incorporated by the state and the rights and franchises of these several railroad companies had been merged into the New York Central Railroad Company under the provisions of an act passed April 2, 1853, being chapter 76 of the laws of that year, and thereby the New York Central Railroad Company acquired the franchises of the various railroad companies which by such consolidation vested in it for the corporate life of 500 years. The New York Central Railroad Company organized under the provisions of this act was subsequently merged with other corporations under the provisions of chapter 302, Laws 1855, and continued in the maintenance of its railroad and the exercise of its powers and franchises down to the year 1869.

By chapter 917, Laws 1869, provision was made for the merging and consolidation of any railroad companies or corporations organized under the laws of this state, or of this state and any other state, whenever the two or more railroads of the companies or corporations so to be consolidated should or may form a continuous line of railroad with each other, or by means of any intervening railroad bridge or ferry. The terms and conditions upon which such consolidation should be carried out was provided for by the act. Section 3 of the act provided that:

"Upon the making and perfecting such agreement and act of consolidation as hereinbefore provided, and filing the same or a copy thereof in the office of the Secretary of State as aforesaid, the said corporations, parties thereto, shall be deemed and taken to be one corporation by the name provided in said agreement."

Section 4 provides:

"Upon the consummation of said act of consolidation as aforesaid, all and singular the rights, privileges, exemptions and franchises of each of said corporations, parties to the same, and all the property, real, personal and mixed, and all the debts due on whatever account to either of said corporations, as well as all stock subscriptions and other things in action belongs to either of said corporations, shall be taken and deemed to be transferred to and vested in such new corporation, without further act or deed; and all claims, demands, property, rights of way and every other interest shall be as effectually the property of the new corporations as they were of the former corporations, parties to the said agreement and act; and the title to all real estate, taken by deed or otherwise, under the laws of this state, vested in either of such corporations, parties to said agreement and act, shall not be deemed to revert or be in any way impaired by reason of this act, or anything done by virtue thereof, but shall be vested in the new corporation by virtue of such act of consolidation."

And section 8 provided that all the provisions of the general railroad act of 1850 and the several acts amendatory thereof and in addition thereto should be applicable to the new corporation so to be formed as aforesaid so far as the same are now applicable to the railroad companies of this state which may be consolidated with any other company or companies by virtue of this act.

In pursuance of the provisions of this act, the New York Central Railroad Company and the Hudson River Railroad Company entered into an agreement of consolidation on the 15th of September in the

year 1869, wherein it is provided that said corporation should continue for the term of 500 years, such consolidated railroad to be known as the New York Central & Hudson River Railroad Company, and to be organized under the provisions of the general railroad act of 1850. Laws 1850, c. 140. By the incorporation of a new corporation by the merger of the New York Central Railroad Company and the Hudson River Railroad Company there was transferred by operation of law to the new corporation "all and singular the rights, privileges, exemptions and franchises of each of said corporations, * * * all the property, real, personal and mixed, and all the debts due on whatever account to either of said corporations, * * * shall be taken and deemed to be transferred to and vested in such new corporation, without further act or deed; and all claims, demands, property, rights of way and every other interest shall be as effectually the property of the new corporation as they were of the former corporations."

The franchise that had vested in the New York Central Railroad Company before consolidation was for 500 years. The franchise that had been granted to the Hudson River Railroad Company was for 50 years from the year 1846. The Legislature then authorized these cor · porations to become consolidated by the formation of a new corporation with a life of 500 years, and transferred to the new corporation the franchise held by both consolidated corporations. The franchises thus transferred were not limited by the period of the original grant to the consolidating corporations, but were granted to the new corporation during the period of its corporate existence. The state created the new corporation to exist for a period of 500 years; and it provided that the franchises owned and operated by the corporations consolidated into the new corporation should be by operation of law transferred to the new corporation. To create a railroad corporation whose sole object of incorporation was to operate and manage a railroad necessarily involves the grant of a franchise, not only to exist as a corporation, but to construct, maintain, and operate a railroad in order to carry out the objects of its incorporation. It seems to me that the effect of the incorporation of the plaintiff for a period of 500 years with a transfer by operation of law of the franchises controlled and operated by two consolidating corporations vested in the consolidated corporation the franchises of the consolidating corporations for the period for which the consolidated corporation was organized. Thus, on compliance with the provisions of the act of 1869, the plaintiff became vested with the franchise to exist as a corporation and also the franchise to construct, maintain, and operate the railroads of both consolidating corporations for the period of its corporate existence. The original act of 1846 contemplated the extension of the term of the franchise granted to the Hudson River Railroad Company, the extension of that franchise was accomplished by the act of 1869, and the consolidation of the Hudson River Railroad Company with the New York Central Railroad Company under it in the plaintiff corporation. The grant of the franchise to the Hudson River Railroad Company was one indivisible franchise from a point on the Hudson River op-

posite the city of Albany to the termination of the railroad in the city of New York, with a right to occupy certain of the streets of New York after the municipal corporation had approved of the occupation by the railroad of the streets selected by it. The right to occupy this street was a part of this indivisible franchise, and neither the municipality of the city of New York nor any other corporation or individual could question its right to the franchise. This conclusion is, I think, sustained by Beal v. N. Y. C. R. R. Co., 41 Hun, 172, and Miner v. N. Y. C. R. R. Co., 123 N. Y. 242, 25 N. E. 339.

This action was brought to enjoin the city of New York from enforcing a resolution of the board of estimate and apportionment directing the president of the borough of Manhattan to remove the plaintiff's tracks from the streets and avenues within the city. If this resolution was an invalid exercise of power by the municipality, it conferred no authority upon the borough president to remove the tracks, and his threatened action would have been an illegal act, which the court was required to enjoin. The plaintiff, as before stated, was exercising a franchise granted by the state. It was conceded that a legal franchise had been granted, but it was claimed by the city that that franchise had expired by limitation. The state has not questioned the right of the plaintiff to exercise the franchise which was granted to the Hudson River Railroad Company, and which was concededly a legal franchise, and, as I understand the settled law of this state, it is the state only that can question the right of a corporation to exercise a franchise granted by the state. Thus it was said in the case of the City of New York v. Bryan, 196 N. Y. 158, 89 N. E. 467:

"While the title to the streets in the borough of Manhattan is in the city, its title is not that of a private owner, but in trust for public purposes. The franchise of the defendants' predecessor proceeded, as already shown, from the state. The constitutional requirement has been complied with, for the city has given its consent. It may well be that public convenience and advantage will be best subserved by allowing the defendants to complete and operate that portion of their road which has been in process of construction. * * * However that may be, the legal status of that franchise and the rights of the defendants, or the company to which they succeeded, to the property and structure created in the execution of the franchise, should be determined only in a litigation between the people of the state, from whom the franchise sprang, and the defendants, wherein a determination will be binding and conclusive on everybody, and not in a suit between the defendants and third parties, unless it is absolutely necessary so to do."

Here the plaintiff was exercising a franchise granted by the state, and in the exercise of that franchise had maintained tracks in certain streets of the city of New York for many years. The use of these tracks was essential for the plaintiff in the exercise of its franchise. The city of New York claimed the right to remove these tracks from the public streets upon the ground that the franchise granted by the people of the state had expired, and in the enforcement of that claim had threatened to forcibly remove the tracks. I think it was for the state, and the state alone, to question the right of the plaintiff to continue to use the franchise that the state had granted, and that neither the municipal corporation nor any one else could by force prevent the exercise of that franchise so long as the state made no objection.

The other questions presented in this case are satisfactorily discussed in the opinion of the referee, and nothing more need be said.

It follows, therefore, that the judgment appealed from must be affirmed, with costs.

CLARKE, SCOTT, and MILLER, JJ., concur.

LAUGHLIN, J. (concurring). If it clearly appeared that the right of the plaintiff to maintain and use its railroad tracks in the public avenues and streets in question has terminated, I would not vote to enjoin the municipal authorities from removing its tracks and excluding it from using the avenues and streets, for I think that the Court of Appeals did not by its decision in City of New York v. Bryan, 196 N. Y. 158, 89 N. E. 467, intend to hold that the city in such case would be powerless to act, and that it would rest entirely with the people of the state, through their Attorney General or otherwise, to intervene or not intervene in their discretion to restore the rights of the public; but it appears to be conceded that the plaintiff was organized by the consolidation of the Hudson River Railroad Company, which was incorporated by chapter 216, Laws 1846, for the period of 50 years only, and the New York Central Railroad Company, which was duly organized under the laws of this state with a charter for 500 years. The consolidation was duly effected during the corporate lives of the two companies, pursuant to the provisions of chapter 917, Laws 1869. It is claimed on the part of the plaintiff that the effect of the agreement between the two companies entering into the consolidation was to incorporate the plaintiff, the consolidated company, for the period of 500 years. I find nothing in the act under which the consolidation was effected which prescribes the term of corporate existence of the consolidated company, or authorizes the companies entering into the consolidation to fix the period of corporate life by agreement between themselves, as was attempted in this case. Our attention is not drawn to any other statute which prescribes the period of corporate existence of the consolidated company, or extends its corporate life with respect to that part of its line and route formerly owned by the other companies, beyond the periods of corporate existence prescribed by their respective charters. The plaintiff, however, continued to exercise the rights, privileges, and franchises which it acquired from the Hudson River Railroad Company, including the privileges of occupying and using the avenues and streets in question, after the expiration of the period prescribed for the corporate existence of that company, under a claim of right, based on the consolidation, on the theory that such rights, privileges, and franchises were continued for the corporate existence of the consolidated company as prescribed in said agreement which corresponded approximately with the corporate life of the other constituent company which was merged in the consolidated company; and, so far as appears, its rights as thus asserted were never questioned by the sovereign power of the state and have been acquiesced in thereby. In exercising such rights, privileges, and franchises, it must therefore be deemed to be a de facto corpora-

tion, and, while its rights in this regard are open to question by the people of the state, they cannot, I think, be called in question with respect to public rights by the appellant which is itself but a creature of the state.

I do not agree with the contention of the learned counsel for the respondent that, aside from the consolidation, the right to use' the avenues and streets in question for railroad purposes was granted as a special franchise in perpetuity, and would have survived the expiration of the corporate existence of the company to which it was granted, and I think there' is abundant authority, particularly in view of the provisions of the charter of the Hudson River Railroad Company, and of the fact that it was not a street railroad, that such permission was only granted originally for the period of its corporate existence.    Turnpike Co. v. Illinois, 96 U. S. 63, 24 L. Ed. 651; People v. Chicago Telephone Co., 220 Ill. 238, 77 N. E. 245; Blair v. Chicago, 201 U. S. 400, 26 Sup. Ct. 427, 50 L. Ed. 801.    I do not regard the decision in People v. O'Brien, 111 N. Y. 1, 18 N. E. 692, 2 L. R. A. 255, 7 Am. St. Rep. 684, as a controlling authority on this point, and I think it is clearly distinguishable on principle.    Here the state was authorizing the incorporation of a steam railroad not to transfer passengers from one place in the city to another, but to transport passengers and freight from the capital to and from New York City and intermediate points, and, instead of fixing a terminus for the railroad company and requiring it at the outset to obtain a private right of way through the city thereto, it authorized the use of public avenues and streets in a designated part of the city free of charge with the consent of the local authorities.

In the O'Brien Case, supra, the Legislature had, after the amendment of the Constitution in 1874, by chapter 252, Laws 1884, provided for a sale at public auction of street railroad franchises, and the court held that the franchise to use the public streets for street railroad purposes thus duly sold survived the dissolution of the corporation before the expiration of the period for which it was created, in the exercise by the Legislature of the power reserved to alter, amend, or repeal charters.

It was, of course, competent for the Legislature to authorize the consolidation of these companies for any period of years; but, since it made no provision on the subject, I think it is extremely doubtful whether by the consolidation the consolidated company was authorized to use the avenues and streets in question for railroad purposes after the expiration of the period originally prescribed for the corporate existence of the Hudson River Railroad Company; and, even if it was so authorized, still I am of opinion that the permission of the Legislature granted to the Hudson River Railroad Company by its charter, with the consent of the municipal authorities, to use the public avenues and streets was a revocable license, and that the continuance of such use now is subject to the will of the Legislature, which may repeal or revoke the license under the express power reserved in the charter of the Hudson River Railroad Company, and under its police power as well.    Illinois Central R. R. Co. v. Illinois, 146 U. S. 387,

13 Sup. Ct. 110, 36 L. Ed. 1018; A. R. T. Co. v. Hess et al., 125 N. Y. 641, 26 N. E. 919, 13 L. R. A. 454, 21 Am. St. Rep. 764; Davis v. Mayor, etc., of N. Y., 14 N. Y. 506–520, 67 Am. Dec. 186; Wabash R. R. v. Defiance, 167 U. S. 88, 17 Sup. Ct. 748, 42 L. Ed. 87; N. Y., C. & H. R. R. Co. v. Aldridge, 135 N. Y. 83, 32 N. E. 50, 17 L. R. A. 516; Michigan Telephone Co. v. City of Charlotte (C. C.) 93 Fed. 11.

The public avenues and streets are held in trust for the use of the people of the entire state primarily for public travel, and while it was competent for the Legislature to authorize their use by a steam railroad company, which is not a street use, the grant of such authority must be strictly construed in favor of the public; and it being doubtful, at least, whether it would be competent for the Legislature to make an irrevocable grant to a steam railroad company to use the public avenues and streets of a great and growing city for steam railroad purposes in perpetuity the permission for such use should be construed as revocable when the use becomes inconsistent with the use of the avenues and streets for their primary purposes of public travel. See Charles River Bridge v. Warren Bridge, 11 Peters, 420, 9 L. Ed. 773; Chenango Bridge Co. v. Binghamton Bridge Co., 27 N. Y. 87; Syracuse Water Co. v. Syracuse, 116 N. Y. 167, 22 N. E. 381, 5 L. R. A. 546; East Ohio Gas Co. v. City of Akron, 81 Ohio St. 33, 90 N. E. 40, 26 L. R. A. (N. S.) 92; Cleveland Electric Ry. v. Cleveland, 204 U. S. 116, 27 Sup. Ct. 202, 51 L. Ed. 399; State v. Minn. T. Ry. Co., 80 Minn. 108, 83 N. W. 32, 50 L. R. A. 656. It may well be that in 1846, when the Hudson River Railroad Company was incorporated, the use of the avenues and streets in question for their primary purposes was not such that human life and property would be seriously endangered, or that the public would be seriously endangered, or that the public would be seriously inconvenienced by permitting the use thereof for railroad purposes also, which at that time it may be assumed were quite limited; but it is not, I think, reasonable to attribute to the Legislature an intent to permit the railroad company, with its increasing business to continue the use of the avenues and streets in perpetuity, and, when therefore in the judgment of the Legislature the interests of the public safety and convenience require that the railroad company shall no longer use the avenues and streets as a means of reaching its terminus, I think it is entirely competent for the Legislature to repeal or revoke the permit and to require the railroad company, under its authority to purchase by private grant or to exercise the right of eminent domain, to obtain a right of way to its terminus over private property, or to consent, if that be necessary, to a change of location of the railroad company's terminus. If the license to use the avenues and streets still continues, it is also competent for the Legislature, under its police power, instead of repealing or revoking the license, to prescribe a plan for the elevation of the tracks above, or the lowering of the tracks below the surface of the avenues and streets, and to require the railroad company to conform with such plan at its own expense, or if it deems that justice so requires, to provide for a division of the expense between

the municipality and the railroad company, or to delegate this authority to the municipality.   See A. R. T. Co. v. Hess et al., supra; C., B. & Q. Railway v. Drainage Com'rs, 200 U. S. 561, 26 Sup. Ct. 341, 50 L. Ed. 596; Chicago, Burlington & Quincy R. R. Co. v. Chicago, 166 U. S. 226, 17 Sup. Ct. 581, 41 L. Ed. 979; New Orleans Gaslight Co. v. Drainage Commission, 197 U. S. 453, 25 Sup. Ct. 471, 49 L. Ed. 831; N. Y. & N. E. R. R. Co. v. Bristol, 151 U. S. 556, 14 Sup. Ct. 437, 38 L. Ed. 269; People ex rel. Geneva v. G. W., etc., Traction Co., 112 App. Div. 581, 98 N. Y. Supp. 119; affirmed 186 N. Y. 516, 78 N. E. 1109; D. L. & W. R. R. Co. v. City of Buffalo, 158 N. Y. 266, 53 N. E. 44.

I am of opinion, however, that the authority in these matters rests with the Legislature, and not with the municipality, and that the municipal authorities were therefore properly enjoined from taking the law into their own hands and attempting to oust the railroad company from the use of the avenues and streets on the theory that such use has become a public nuisance.